UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LORRIE  HAMILTON,                    )
                                     )
                    Plaintiff,       )
                                     )
          vs.                        )
                                     )        No. 1:12-cv-01614-SEB-DML
REPUBLIC AIRWAYS HOLDINGS            )
doing business as REPUBLIC AIRLINES, )
                                     )
                    Defendant.       )

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 40], filed on November 19, 2013, pursuant to Federal Rule of Civil Procedure 56.  Plaintiff Lorrie Hamilton has brought this claim against her former employer, Defendant Republic Airways Holdings, Inc. ("RAH") d/b/a Republic Airlines, Inc. ("Republic"), alleging that she was terminated in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*  For the reasons detailed below, we GRANT Defendant's Motion for Summary Judgment.

### Factual Background

**Defendant's Policies and Procedures**

On July 1, 2010, RAH hired Ms. Hamilton to work as a reserve flight attendant for Republic, an RAH subsidiary.  At all times relevant to this litigation, there were a number of RAH policies and procedures in place that governed Ms. Hamilton's employment with

1

RAH. RAH's Anti-Discrimination and Harassment policy provided in relevant part:

"The Company does not and will not permit associates to engage in unlawful

discriminatory practices, sexual harassment, or harassment based on race, color, religion,

gender, national origin, age, or disability." Hamilton Dep. Exh. 7A (Associate Handbook

Sec. 2.2).

RAH's Conduct and Disciplinary Action policy provided in pertinent part as

follows:

> Associates who violate Company rules and policies will normally be given
> an opportunity to improve. Disciplinary actions are usually corrective and
> progressive in nature. However, serious misconduct and work performance
> problems or violations of laws and certain policies may warrant immediate
> disciplinary action, which may be accelerated to any level at any time, that
> may include suspension or termination of employment.

Hamilton Dep. Exh. 7C (Associate Handbook Sec. 9.1.1). The non-exhaustive list of

Conduct Rules violations includes: insubordination (e.g., a trip refusal), dishonesty, and

abuse or violations of any or all Company policies and operational procedures. RAH's

policies also provide that a flight attendant on reserve status cannot deny or refuse a trip

assignment. Ms. Hamilton concedes that a trip refusal is a terminable offense. Hamilton

Dep. at 153.

RAH's collective bargaining agreement, which was applicable to Ms. Hamilton,

provides that a reserve flight attendant "who is unable to begin or complete an

assignment or portion thereof because of illness or injury will immediately notify Crew

Scheduling in accordance with [RAH's Sick Leave Policy]." Pl.'s Exh. I (Scheduling

Policy, Sec. N(2)). RAH's Sick Leave Policy provides in pertinent part: "The Company

may request a doctor's note after a flight attendant has been off duty due to illness or injury in excess of three (3) consecutive days or where there may be suspected abuse." Pl.'s Exh. J (Sick Leave Policy, Sec. H). RAH's Attendance Policy provides a four-step progressive disciplinary process based on "occurrences." However, the process can be initiated at any step, including termination, "depending on the severity of the situation." Pl.'s Exh. K (Attendance Policy, Sec. D; Sec. E). RAH's Attendance Policy provides that abuse of sick leave benefits constitutes a terminable offense. Hamilton Dep. Exh. 6E (Attendance Policy, Art. 30(A)(5)).

RAH's Hours of Service policy provides that flight attendants away from base will not be scheduled for less than eight and a half hours of rest, and must actually receive eight hours of rest between their release from one flight assignment and their report time to another. "Rest" means rest in a hotel, and does not include sleeping on an airplane en route to an assignment or time spent waiting at the airport.

**Plaintiff's Migraines**

Ms. Hamilton has suffered from migraines all of her life and usually experiences a couple of episodes a month. She gets some warning when a migraine is coming on. They usually start out as headaches, which Ms. Hamilton is generally able to tolerate. At times, Ms. Hamilton's migraines are sufficiently mild that she is able to continue performing her daily activities. However, stress causes her migraines to worsen, often to the point where she cannot function, when she experiences blurred vision, nausea, and vomiting and needs to be in a dark, quiet room. Occasionally, Ms. Hamilton gets a

migraine so severe that she must go to the emergency room to be treated with intravenous medication.

**Plaintiff's Attendance History and Application for Intermittent FMLA Leave**

On April 8, 2011, Ms. Hamilton called in sick when RAH sought to assign her to work a two-day flight while she was on reserve status. Scheduler Melody Hall took Ms. Hamilton off reserve status for April 8, and put her on reserve status for the next day. When Ms. Hall emailed Brian Essig, RAH's manager of crew scheduling, about Ms. Hamilton's call-in, Essig stated that Hamilton was "another IND based [flight attendant] that traded into these [reserve] days that has called off sick" and remarked that "[a]gain [t]his is becoming way to[o] common." Pl.'s Exh. F.

That same month, Cindy Blevins, RAH's Base Supervisor for Indianapolis, emailed RAH employee Christine Worthley to report that "[Ms. Hamilton] called off after having three weeks off (vacation)." Pl.'s Exh. G4. RAH apparently intended to give Ms. Hamilton a Job Performance Warning because she reportedly failed to follow the correct procedure for calling in sick while on reserve, but there is no record that such a warning was ever given to Ms. Hamilton.

On September 30, 2011, scheduler Samantha Norman informed Mr. Essig that Ms. Hamilton "had called in sick, stated that she was having bad migraines and that since she had already taken her medicine, she could not fly like that." Pl.'s Exh. H. Ms. Norman reported that she therefore "took [Ms. Hamilton] off her 2 day trip." *Id.*

On October 12, 2011, Ms. Hamilton received a verbal warning because she had accumulated four "occurrences" under the Attendance Policy, all of which were for

instances when she called in sick. It is not clear whether all of these absences were due to her migraine headaches or other illnesses as well. However, because of her migraine headaches, on December 20, 2011, Ms. Hamilton requested information from RAH regarding instructions for receiving intermittent FMLA leave. RAH provided Ms. Hamilton with the information, and, on January 6, 2012, RAH approved Ms. Hamilton's application for intermittent FMLA leave to be used for migraine headaches. No one at RAH made any disparaging remarks about Ms. Hamilton's migraines or her health condition during her employment with RAH.

**Events Leading to Plaintiff's Termination**

Near the end of December 2011, Ms. Hamilton attempted to trade away her reserve status for January 10, 2012 to a fellow flight attendant, Brandon Roe. RAH denied the request, however, because the trade would have created rest issues for Mr. Roe relating to his contractually required minimum rest period between duty periods.

On January 8, 2012, RAH advised Ms. Hamilton (who was at that point on reserve status) of her trip assignment/pairing on January 9, 2012 from IND (Indianapolis) to DCA (Washington D.C.) (Flight 3294) // DCA to IND (Flight 3495). Because her trade request had been denied, at the time of this assignment Ms. Hamilton remained on reserve status for January 10, 2012.

During the first leg of Ms. Hamilton's flight pairing on January 9, 2012, the aircraft experienced mechanical issues. At approximately 9:39 p.m. and 9:45 p.m. that evening, RAH's scheduling department advised Ms. Hamilton by telephone that she had been removed from the pairing and would be repositioned in order to perform a new

assignment during her scheduled reserved period on January 10, 2012.[1]  RAH maintains

recordings of these telephone calls, which were submitted as evidence.  In the 9:39 p.m.

call from Crew Scheduling, Ms. Hamilton was told that she would no longer be taking

the return flight to Indianapolis from Washington D.C. but that she would instead be sent

to Greensboro, North Carolina, on a deadhead that night and would then be assigned

another trip the next morning, on January 10, 2012.  In response, Ms. Hamilton

repeatedly stated: "I have nothing with me," and, "I can't go with nothing."  Hamilton

Dep. Exh. 35 at RA 001975-76.  Ms. Hamilton then asked, "[W]hat am I going to do, get

in trouble?"  *Id.* at RA 001975.  The first call ended after Ms. Hamilton requested that

Crew Scheduling "not mark [her] off anything" until she was able to "figure out what's

going on," as the flight back to Indianapolis had not yet been cancelled.  *Id.* at RA

001976.  She further stated that she needed to contact her family as well and that she

would call back "as soon as I know something."  *Id.*

    A different scheduler, Samuel Redden, called Ms. Hamilton at 9:42 p.m. and left a

voicemail message informing her that, if Crew Scheduling did not hear back from her in

"about 10 to 15 minutes," they were "going to mark it down as a trip refusal."  *Id.* at 3.

Ms. Hamilton returned the call to Crew Scheduling at 9:45 p.m., explaining that she was

waiting to hear whether the return flight to Indianapolis was cancelled.  Mr. Redden

informed her that it had in fact been cancelled and that, in any event, she was needed in

---

[1] At the time period relevant to this litigation, Ms. Hamilton also worked occasionally as a bus driver when it did not conflict with her flight assignments.  When asked in her deposition whether it was possible that she wanted January 10, 2012 off because she had an opportunity to drive the bus, Ms. Hamilton testified: "Oh.  Somebody may have needed me to drive on the 10th. Yes.  Okay.  Sorry."  Hamilton Dep. at 62-63.

Greensboro.  Ms. Hamilton reiterated that she had no clothes with her.  Mr. Redden

responded that he understood, but that she was on reserve.  Ms. Hamilton interrupted,

stating, "Okay, well I have a migraine then, so you can call me off then – I'm just FMLA

then.  I have a migraine."  *Id.* at 4.  Mr. Redden responded that he would take her off and

mark her as unavailable and the telephone conversation ended.

Approximately twenty minutes later, at 10:06 p.m., Mr. Redden emailed his

supervisors, stating:

> Lorrie Hamilton … has called off UNA for today.  He[r] flight DCA-IND
> was [cancelled] due to [maintenance].  At the same time we took a GSO
> call off and a [deadhead] was leaving to DCA to GSO.  Lorrie Hamilton
> was on [reserve] today AND tomorrow.  When we called to tell her she was
> reassigned to [deadhead] from DCA to GSO, she stated that she didn't have
> anything for an overnight.  Jordan then talked to me about it, and I told him
> that even though she doesn't have anything, she is still [reserve] and we
> have to use her for a GSO flight that is open.  She said that she needed to
> call her family and got "disconnected" from Jordan.  She didn't at the
> time[] call off nor accept the trip.  I then called her, stating that she and
> Jordan got disconnected and that she needed to call back or I'd have to
> mark her as a trip refusal.  At this time, she was stuck overnight either way.
> She called back minutes later and the first thing she said is that she didn't
> hang up on Jordan.  I told her that I didn't say anything like that, that I
> merely said that they were disconnected.  I then repeated what Jordan had
> told her.  When she again said she didn't have anything with her, I told her
> that I understand that, but she is a [reserve] and we had to use her.  She
> quickly stated that she has FMLA for migraines and that she "has a
> migraine" and is calling off FMLA for the rest of tonight and tomorrow.  I
> coded it as UNA for now.  The call was around 2150 on 2405.

Redden Aff. Exh. A.  That same night, at 11:38 p.m., Ms. Hamilton emailed Mr. Essig,

stating as follows:

> Just got to hotel from our cancelled flight which should have been an out
> and back to DCA tonight … needless to say under the stress of not knowing
> whether we were going to get home tonight or our crew was going to be
> stuck I got a migraine so I called off tomorrow unavailable until it can be

coded with my FMLA … now they are telling me that they can't get me a flight home tomorrow with the crew until they get an approval from you … I have never not been there for the crewschedulers [sic] nor do I abuse my sick time or FMLA which I just had to take … Please understand the frustration as being stuck somewhere with no medicine or anything else for that matter … Please let me know as soon as you can what I need to do to get home in the am to get my medicine ….

Hamilton Dep. Exh. 38 (ellipses in original).  Ms. Hamilton did not end up returning to Indianapolis that night, but instead spent the night in Washington D.C. and returned to Indianapolis on a 7:45 a.m. flight the next morning, January 10, 2012.

**Defendant's Investigation into the Events of January 9, 2012**

After receiving Mr. Redden's and Ms. Hamilton's email communications, RAH commenced an investigation into the events that occurred on January 9, 2012, and suspended Ms. Hamilton while the investigation was pending.  As part of RAH's investigation, Lisa Evans, RAH's Leave of Absence Supervisor, and Mr. Essig reviewed the recorded calls between Ms. Hamilton and Crew Scheduling.  On January 10, 2012, while RAH's investigation was pending, Ms. Evans received an email from Captain Denny Darnell, which stated as follows:

Ms. Evans,

Around 10:50 PM on January 9, 2012, I was on the DCA Crowne Plaza shuttle to the hotel when a Republic Airlines Flight Attendant boarded the bus.  She was very vocal about being upset.  On the van there were five (5) Shuttle America crew members, two (3) [sic] Republic Airlines crew members, two (2) American Airlines crew members and a passenger.  This particular flight attendant had been scheduled to operate the flight from DCA-IND which had been cancelled due to an airplane mechanical issue.  She was irate about not being allowed to fly with the cockpit crew on the ferry flight to IND.  She stated the "FAA says it is unsafe."  I inquired with the Republic Airlines crew members if tomorrow (1/10/12) was a scheduled fly off day.  The other flight attendant stated that it was a day off and the

8

irate flight attendant stated she was on reserve.  She then proceeded to talk to the rest of the passengers on the bus when she stated[,] "They wanted me to go to GSO tonight and work tomorrow and I was like … NO! … FMLA."  She then made a phone call and spoke at a level where the rest of those on the bus could hear (duration of the bus ride).

Parts of the conversation included the following:

"I don't have to work tomorrow[.]"

"They can't give me an unavailable[.]"

"I just said FMLA, what can they do, it's FMLA[.]"

"I didn't want to work tomorrow[.]"

These statements were alarming to me and I used caution because I only heard one side of the conversation.  It is also concerning that she would just verbalize this information to a group of other people.  It came across as "look at me" and "you can't make me do that."

Evans Aff. Exh. I.  At the time he sent this email, Captain Darnell had never met Ms. Hamilton and his email did not identify by name the Republic Airways flight attendant referenced therein.

On January 10, 2012, at 11:37 a.m., based on the review of the telephone calls between Ms. Hamilton and Crew Scheduling and the email communication from Captain Darnell, Ms. Evans reported to her superiors at RAH, including but not limited to Director of Employee Relations Brian Beidelman and Director of Inflight Amy Chiappe, that she had concluded that Ms. Hamilton's actions on January 9, 2012 constituted a trip refusal, and, more likely, FMLA abuse.  Mr. Beidelman and Ms. Chiappe then reviewed the recorded calls and emails and spoke with Ms. Evans and other RAH employees, and jointly made the decision to terminate Ms. Hamilton's employment.  The reason given for their termination recommendation was a trip refusal and attempted abuse of FMLA leave.

**Plaintiff's Termination**

On January 13, 2012, RAH conducted a conference call with Ms. Hamilton and the Union in order to determine if either Hamilton or the Union had any additional evidence to present regarding the events that transpired on January 9, 2012, that could affect the termination decision. During this call, RAH shared with Ms. Hamilton the evidence on which it was relying to support its termination decision, to wit, the tape recorded calls on January 9, 2012 between Ms. Hamilton and Crew Scheduling, and the email statement from Captain Darnell. Ms. Hamilton did not request that RAH conduct further investigation or to speak with any additional witnesses nor did she or the Union present any additional evidence for consideration. RAH then advised Ms. Hamilton of its decision to terminate her employment.

**The Instant Litigation**

On November 5, 2012, Ms. Hamilton filed her complaint, alleging that her termination was in violation of the ADA and FMLA. RAH's motion for summary judgment was filed on November 19, 2013, and is now fully briefed and ready for ruling.

## <u>Legal Analysis</u>

### I.    **Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary

judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II. FMLA Claims

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the statute]." 29 U.S.C.

§ 2615(a)(1).  In addition, it is unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  *Id.* § 2615(a)(2).  Here, Ms. Hamilton claims that RAH violated both of these provisions by interfering with her rights under the FMLA and terminating her in retaliation for her request to take FMLA leave.  We address these claims in turn.

### A.    Interference with FMLA Rights

"To prevail on a claim for FMLA interference, the employee must prove that: (1) [s]he was eligible for FMLA protections; (2) [her] employer was covered by the FMLA; (3) [s]he was entitled to leave under the FMLA; (4) [s]he provided sufficient notice of [her] intent to take FMLA leave; and (5) [her] employer denied [her] FMLA benefits to which [s]he was entitled."  *Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir. 2012) (quotation marks and citation omitted).  Here, the only dispute relates to the fifth element, to wit, whether RAH denied Ms. Hamilton FMLA benefits to which she was entitled.  An employee who takes leave under the FMLA must take it "for the intended purpose of the leave."  29 U.S.C. 2614(a)(1).  Accordingly, "an employer can defeat an interference claim by showing, among other things, that the employee did not take leave 'for the intended purpose.'"  *Scruggs*, 688 F.3d at 825 (quoting *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008)).  To do so, an employer need show only that it had "an 'honest suspicion' that she was abusing her leave.'"  688 F.3d at 826 (quoting 533 F.3d at 909).

RAH claims that, based on its review of the January 9, 2012 recorded conversations between Crew Scheduling and Ms. Hamilton, coupled with the subsequent

report from Captain Darnell recounting statements he overheard a Republic Airways flight attendant make on the airport shuttle in Washington D.C. later that same night, it honestly suspected that Hamilton was attempting to abuse her leave when she claimed that she was unable to fly on January 10, 2012 because she had a migraine, and further, that her conduct constituted a trip refusal under the company's policies.  Upon review of that same evidence, we find that RAH has shown that it held an "honest suspicion" that Ms. Hamilton was attempting to misuse her FMLA leave on January 9, 2012 for a flight assignment on January 10, 2012, and thus, that her FMLA interference claim cannot survive summary judgment.

It is true, as Ms. Hamilton argues, that this incident was the first time she was attempting to use her intermittent FMLA leave and thus RAH had no prior record of suspected misuse nor did it collect any sort of tangible evidence before it terminated her such as video surveillance of her engaging in physical activities when she was supposed to be on leave or something similarly suspicious.  *Cf. Scruggs*, 688 F.3d at 823-24 (employer in possession of video surveillance and documentation suggesting FMLA abuse); *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 674-75 (7th Cir. 1997) (employer relied on videotaped evidence and prior accusations of unethical conduct). However, RAH did have the recordings of the telephone calls in which Ms. Hamilton invoked her FMLA rights and conducted other investigatory procedures to gather the relevant facts relating to this absence.  Our review of the recordings in particular leaves us convinced that no reasonable person could believe that Ms. Hamilton's invocation of her FMLA rights was credible.

Generally, it is not within our purview to make a credibility determination at the summary judgment stage. Here, however, we find that no reasonable juror could find Ms. Hamilton credible based on the recordings of her conversations with Crew Scheduling. During both conversations, Ms. Hamilton consistently and repeatedly stated that she could not fly because she had "nothing" with her and never made any mention whatsoever of suffering from a headache or a migraine, or even that she felt a headache or migraine coming on until it became clear that she would be unable to avoid being sent to Greensboro, N.C., merely by stating that she had no clothes or other essentials. It was only at the end of her second conversation with Crew Scheduling that she abruptly changed course, flippantly stating, "Okay, well I have a migraine then, so you can call me off then – I'm just FMLA then. I have a migraine." Pl.'s Exh. D at RA 001978.

Courts often look to the reasonableness of the explanation when determining whether an employer's explanation is honest. *See Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008) ("We have explained that the honesty of an employer's statement is often revealed by analyzing its reasonableness; the more objectively reasonable the explanation, the more likely it honestly motivated the challenged employment action."). Given the fact that, after repeatedly providing other explanations, Ms. Hamilton hastily switched her reason for being unable to accept the January 10, 2012 flight assignment to a migraine when it became clear that Crew Scheduling would not accept her original non-FMLA reasons, coupled with the petulant

and perfunctory manner in which she did so, we find it clearly objectively reasonable for RAH to have suspected that Ms. Hamilton was attempting to misuse FMLA leave.[2]

RAH's suspicions were bolstered by the email it received the next day from Captain Darnell recounting statements he overheard from an unidentified Republic Airways flight attendant on the airport shuttle in Washington D.C. the night of January 9, 2012. We concede that Captain Darnell was unable to identify the flight attendant who was speaking, but based on the content of the statements overheard by him and the surrounding circumstances (e.g., the statements were made by a Republic Airways flight attendant in the airport shuttle from DCA shortly after Ms. Hamilton had been speaking with Crew Scheduling about the same issues), it was eminently reasonable for RAH to conclude that the speaker was Ms. Hamilton and to regard those statements as additional corroborative evidence that she was attempting to abuse her FMLA leave, and thus, in effect refusing a trip assignment while on reserve status.

Ms. Hamilton cites other evidence that she contends creates a genuine issue of material fact regarding whether RAH honestly believed that she was attempting to misuse

_____

[2] Our decision would be different if the telephone conversations had merely raised a question as to Ms. Hamilton's credibility, which would then have created a factual issue for a jury to resolve. For example, this is not a case in which Ms. Hamilton, knowing she was on reserve status and could not refuse a trip for reasons other than illness or injury, contacted Crew Scheduling prior to receiving an assignment to advise that she had a migraine. Nor do the facts before us establish that Ms. Hamilton immediately stated that she was suffering from a migraine when she was initially told she was to fly to Greensboro, or, even that, at the beginning of the second call, she told Crew Scheduling that the stress both of not knowing whether the flight was cancelled and then of having to assist passengers in rescheduling their flights brought on a migraine, as she now claims was the case. Such fact patterns most likely would have raised a genuine issue of material fact regarding whether RAH held an honest belief of FMLA abuse when it terminated Ms. Hamilton, at least without evidence of previous instances of suspected misuse, an admission of FMLA abuse, or a showing that an investigation that produced tangible proof of suspicious activity had been conducted before the termination decision was made.

FMLA leave and had refused a trip assignment on January 9, 2012. However, none of that evidence, either alone or when considered together, is sufficient to support an inference that RAH's proffered reasons for terminating Ms. Harrison were merely pretext for FMLA discrimination.

For example, Ms. Hamilton maintains that it is reasonable to infer pretext from the fact that RAH deviated from both its attendance and rest policies when it terminated her. The evidence does not support this conclusion, however. Although RAH's attendance policy generally provides for a four-step, progressive disciplinary process, it also states that discipline may be initiated at any step, including termination, "depending on the severity of the situation," and that abuse of benefits constitutes a terminable offense. This is precisely what RAH claims it believed Ms. Hamilton did when she attempted to invoke her FMLA rights on January 9, 2012, and why it terminated her based on both its attendance policy and its Conduct and Disciplinary Action policy. Ms. Hamilton argues that RAH's belief could not have been honestly held because, at the time it terminated her, it had no evidence from a medical professional that she did not have a migraine. Instead, the only evidence RAH had was its subjective evaluation of her language and tone of voice during the telephone conversations with Crew Scheduling as well as Captain Darnell's reported observations (failing to mention the important factor of the timing of these events). But Ms. Hamilton fails to cite any case requiring that an employer either possess medical training itself or secure the opinion of a medical professional in order to form an honest belief that an employee is abusing FMLA leave.

Nor does the evidence establish that requiring Ms. Hamilton to accept the Greensboro flight assignment was in violation of RAH's rest policy. Ms. Hamilton contends that if she had accepted the assignment to go to Greensboro, it would have violated her rest requirements because she would have had less than the mandated eight hours of rest in between flights. However, Mr. Essig testified that if Ms. Hamilton had accepted the Greensboro assignment, RAH would have adjusted the departure time for the flight pairing leaving Greensboro on January 10, 2012 to accommodate her rest requirements. Ms. Hamilton has brought forth no evidence to contradict that testimony or to establish that doing so would have been unusual or otherwise against RAH's standard practices. In any event, the arguments advanced by Ms. Hamilton regarding any violation of the rest policy are after the fact, having nothing to do with her alleged migraines or the invocation of her FMLA rights. Thus, nothing about the Greensboro assignment casts suspicion on RAH's proffered reasons for Ms. Hamilton's termination.

Ms. Hamilton further attempts to cast doubt on the veracity of RAH's proffered explanation for her termination by pointing to discrepancies between the transcripts of the recorded calls on January 9, 2012 and the RAH's decisionmakers' account of what transpired during those calls. To the extent the discrepancies exist, they are not sufficient to erode RAH's honest belief or call it into serious question. For example, Ms. Hamilton focuses mainly on Ms. Chiappe's testimony that she agreed to the termination because "the call specifically shows that [Hamilton] changed her story once the trip refusal was mentioned." It is true that the term "trip refusal" was not actually used in either of Ms. Hamilton's January 9, 2012 conversations with Crew Scheduling. However, such a

discrepancy does not alter our analysis. Under RAH's policies, Ms. Hamilton could not as a reserve flight attendant refuse a trip for any reason other than illness or injury. Throughout both of the calls, Crew Scheduling repeatedly dismissed Ms. Hamilton's explanation that she had no personal effects or clothing with her and when Ms. Hamilton interrupted the scheduler at the end of the second call to say she had a migraine, he was in the middle of reminding her that she was on reserve (and thus, under RAH's policies, required to accept the trip). Accordingly, while the term "trip refusal" was never expressly spoken, that is essentially what Crew Scheduling was telling Ms. Hamilton at the point when she changed her reason for being unable to accept the flight assignment from a non-FMLA to a FMLA reason. Thus, the discrepancy Ms. Hamilton cites does not cast doubt on RAH's assertion that it had an honest belief that Ms. Hamilton's attempt to use FMLA leave in order to avoid accepting the assignment to Greensboro constituted a trip refusal and attempted FMLA abuse.[3]

---

[3] Ms. Hamilton contends that even if Ms. Chiappe's mischaracterization of the telephone conversations does not evidence pretext, a jury could infer that both Chiappe and Mr. Beidelman were merely "cat's paws" who were manipulated to reach their termination decision by their subordinates, namely, Ms. Young, Ms. Morely, Ms. Evans, and Mr. Essig, who Hamilton alleges had discriminatory motives and intended to bring about her termination. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 717 (7th Cir. 2013) ("The cat's paw theory applies in the employment discrimination context when a biased subordinate who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.") (internal quotation marks and citation omitted). However, the cat's paw theory "cannot be employed to impute a discriminatory motive to an unbiased decisionmaker when the 'decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee.'" *Id.* (quoting *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011)). Here, the evidence establishes that after Ms. Evans reported her findings to Ms. Chiappe and Mr. Beidelman, they themselves subsequently reviewed the recorded calls and email from Captain Darnell before making the termination decision. Moreover, in her deposition, Ms. Hamilton repeatedly testified that she knew of no one who

Finally, in support of her pretext argument, Ms. Harrison also points to the timing of her termination, to wit, that she was terminated on the first occasion that she attempted to use her intermittent FMLA leave, her application for which having been approved by RAH only three days earlier. It is true that in some cases a termination coming close in time to the authorization of FMLA leave might give rise to an inference of discrimination, but it is well-settled under Seventh Circuit law that suspicious timing alone fails to defeat summary judgment. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (holding that "[s]uspicious timing alone rarely is sufficient to create a triable issue" and "mere temporal proximity is not enough to establish a genuine issue of material fact") (internal quotations marks and citations omitted). Such is the case here. Without more, the fact that Ms. Hamilton was terminated on the first occasion when she attempted to use FMLA leave is, standing alone, insufficient to raise an inference of discrimination.

In short, our review of both the recordings and the transcripts of the recorded calls from January 9, 2012, coupled with the subsequent report from Captain Darnell, confirms the reasonableness and legitimacy of RAH's proffered reason for terminating Ms. Hamilton, to wit, that it believed she was attempting to misuse FMLA leave and had refused a trip assignment. RAH's honestly held suspicion was, we conclude, the true

---

possessed an animus towards her or was "gunning" for her termination. Hamilton Dep. at 87, 94-95, 101-02, 137, 169, 216.

motivation for her termination.[4]  Accordingly, we <u>GRANT</u> Defendant's Motion for Summary Judgment as to Plaintiff's FMLA interference claim.

### B.    FMLA Retaliation

The FMLA prohibits employers from retaliating against an employee who exercises or attempts to exercise FMLA rights.  29 U.S.C. § 2615(a)(2).  Claims of FMLA retaliation are evaluated "the same way that we would evaluate a claim of retaliation under other employment statutes."  *Buie v. Quad/Graphics Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).  Here, Ms. Hamilton's FMLA retaliation claim is essentially a reformulation of her FMLA interference claim.  Because, as detailed above, RAH has shown that it terminated Ms. Hamilton's employment not for unlawful reasons, but instead based on its honest suspicion that she was attempting to abuse her FMLA leave and refuse a flight assignment, her FMLA retaliation claim likewise must fail.  As the Seventh Circuit has recognized, if we were to hold otherwise, "virtually any FMLA plaintiff fired for misusing [her] leave would be able to state a claim for retaliation." *Scruggs*, 688 F.3d at 827.  Thus, Defendant's Motion for Summary Judgment as to Plaintiff's FMLA retaliation claim is <u>GRANTED</u>.

## III.    ADA Disparate Treatment Claim

---

[4] Ms. Hamilton also argues that it is reasonable to infer that RAH did not honestly believe she was abusing her FMLA leave because an unidentified flight attendant was abusing his FMLA leave in a significantly more obvious way than Hamilton and yet was not terminated.  Without more details regarding this unnamed flight attendant and the circumstances surrounding his conduct, we are unable to determine whether he is in fact similarly situated to Ms. Hamilton, and whether his treatment has any relevance to the case before us.

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Ms. Hamilton has brought along with her other theories of relief, a claim for disparate treatment under the ADA, alleging that she was terminated because of a disability. A plaintiff bringing a disability discrimination claim under the ADA may proceed under the direct or indirect method of proof. Ms. Hamilton's claim fails under both methods.

To prevail on her ADA discrimination claim using the direct method of proof, Ms. Hamilton must establish that: (1) she is disabled as defined by the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job she held; and (3) she suffered an adverse employment action because of her disability. *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006). Even assuming that Ms. Hamilton is able to satisfy the first two prongs of the direct method test, she has failed to establish the third prong, to wit, that she was terminated because of her disability. As discussed above, RAH has shown that it terminated Ms. Hamilton because it possessed an honest belief that she attempted to abuse her FMLA leave and that she refused a flight assignment, which are reasons wholly unrelated to her disability status.

Ms. Hamilton's ADA claim fares no better under the indirect method. Even if we assume she was able to make out a *prima facie* case of discrimination using the burden shifting method of proof, RAH has put forth a legitimate nondiscriminatory reason for

her termination, to wit, that it honestly believed she had refused a flight assignment and attempted to abuse her FMLA leave, and, for the reasons detailed above, Ms. Hamilton has failed to demonstrate that RAH's reason is merely pretext for discrimination. *See Bunn v. Khoury Enterprises, Inc.*, ___ F.3d ___, 2014 WL 2198557, at \*7 (7th Cir. May 28, 2014) ("[I]f a legitimate reason is produced [under the indirect method], the employee must prove by a preponderance of the evidence that the employer's stated reason is a lie."). Accordingly, we <u>GRANT</u> Defendant's Motion for Summary Judgment on Plaintiff's ADA claim.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: _____07/02/2014_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jay Meisenhelder
EMPLOYMENT AND CIVIL RIGHTS LEGAL SERVICES
jaym@ecrls.com

David J. Carr
ICE MILLER LLP
david.carr@icemiller.com

Paul Conrad Sweeney
ICE MILLER LLP
paul.sweeney@icemiller.com

Kenneth D. Pack
REPUBLIC AIRWAYS HOLDINGS
kpack@rjet.com